## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

Kathy D. Holler,
    Plaintiff

vs

Case No. 1:06-cv-764-MHW-TSH
(Watson, J.; Hogan, M. J.)

Hartford Life and Accident
Insurance Company,
    Defendant

## REPORT AND RECOMMENDATION

This matter is before the Court on plaintiff Kathy Holler's motion for judgment as a matter of law (Doc. 26), defendant Hartford Life and Accident Insurance Company's (Hartford's) memorandum in opposition to plaintiff's motion and for an order affirming the administrative decision (Doc. 27), and plaintiff's reply. (Doc. 29). Also before the Court is the Administrative Record filed by defendant Hartford comprised of Hartford's Long Term Disability Benefits Plan documents at AR 1-23 and the documents which constitute plaintiff claims file at ADM 1-1441. Based on these documents and the Court's painstaking and thorough review of the hefty Administrative Record, and for the reasons set forth more fully below, this Court recommends that plaintiff's motion for judgment be granted on her ERISA claim for benefits.

## BACKGROUND

This case has a long and tortuous background and procedural history with which the District Court is well familiar, and which can be summarized as follows.[1] Plaintiff was employed by Flour Daniel Fernald from 1992 to 2001. In October 1999, plaintiff applied for long term disability benefits under a group insurance policy issued and administered by defendant Hartford. Plaintiff's claim was based on diagnoses of fibromyalgia, thoracic outlet syndrome, and low back pain and was initially approved for an award of benefits under Hartford's Long Term Disability Benefits Plan (the Hartford Plan) in December 1999. In December 2000, Hartford determined that plaintiff was no longer disabled under the terms of the Plan and terminated her LTD benefits. That termination decision was based, in part, on surveillance video showing plaintiff's activities outside her home prior to going to a work evaluation scheduled by Hartford, outside a shopping mall following the evaluation appointment, and upon plaintiff's return home. Hartford's termination of plaintiff's LTD benefits became effective as of November 30, 2000.

Plaintiff appealed the administrative decision, which was upheld upon administrative review, and subsequently filed a *pro se* ERISA action for judicial

---

[1]     This is the third of three ERISA cases filed in this Court by plaintiff Holler concerning the termination of her LTD benefits under the Hartford Plan. This Court takes judicial notice of the District Court Opinions and Orders issued in Kathy D. Holler v. Hartford Life and Accident Insurance Company, S.D. Ohio Case No. 1:04-cv-37-MHW-TSB (*Holler I*) and Kathy D. Holler v. Hartford Life and Accident Insurance Company, S.D. Ohio Case No. 1:06-cv-405-MJB-TSB (*Holler II*). Given that the Administrative Record in this case totals over 1400 pages, the Court will cite to particular portions of the record as necessary for its analysis of the issues raised by the present motion. Insofar as the Court seeks to summarize the background and history of this case, the Court incorporates by reference *Holler* I Documents 31 and 33 and *Holler* II Documents 24 and 28.

2

review of Hartford's decision to terminate her benefits (*Holler I*). In October 2005, this Court, Judge Michael H. Watson presiding, found that defendant Hartford's decision to terminate plaintiff's LTD benefits was arbitrary and capricious and entered judgment in favor of Holler. (*See Holler I*, Doc. 33). Because Holler's LTD claim was still within the first thirty-six months, the Court's decision in *Holler I* only addressed whether plaintiff was entitled to LTD benefits under the terms of the Plan as a result of being prevented from performing the essential duties of her own occupation. (*See Holler I*, Doc. 51, pp. 3-5).

Following the Court's decision in *Holler I*, defendant Hartford calculated the award of benefits due to plaintiff under the Plan and determined that based on off-sets for Social Security Disability payments Holler received and a lump sum payment she received from her retirement account, Hartford did not owe plaintiff any additional sums. In fact, defendant determined that plaintiff had been overpaid and sought reimbursement from plaintiff. The ensuring conflict spawned the litigation now referred to as *Holler II*, and resulted in a judgment from this Court, Judge Michael R. Barrett presiding, that the administrative decision requiring an off-set of plaintiff's pension benefits was not arbitrary or capricious. (*Holler II*, Doc. 28).

Under the terms of the Plan, and as noted by the Court in *Holler I*, LTD benefits were awarded to plaintiff for an initial period of thirty-six months based on a finding that she was "totally disabled" under the terms of the plan "from performing the essential duties of [her own] occupation." (Doc. 21, Administrative Record, p. AR 7. *See also Holler I*, Doc. 33, pp. 6-7 and Doc. 51, pp. 3-4). Under the terms of the Plan, in order to continue receiving LTD benefits after the initial thirty-six month

period, plaintiff "must be so prevented from performing the essential duties of any occupation for which [she] is qualified by education, training, or experience." (Doc. 21, AR 7). By letter dated June 2, 2006, Hartford informed plaintiff that it had conducted a review of her claim and determined that she did not meet the definition of disability beyond October 14, 2002, under the "any occupation" standard applicable to her continuing LTD claim. (Doc. 2, Administrative Record, p. ADM 196-202). Plaintiff appealed the decision to deny her benefits under the "any occupation" Plan provisions. The administrative decision denying benefits was upheld on appeal by letter to plaintiff dated September 29, 2006. (ADM 30-40). Plaintiff initiated this ERISA action, pursuant to 29 U.S.C. §1132(a), seeking judicial review of Hartford's decision to deny her LTD benefits under the Plan's "any occupation" provision.

Plaintiff argues that she is entitled to judgment on the merits because defendant Hartford abused its discretion by denying her claim for LTD benefits under the "any occupation" standard. Plaintiff points to seven factors which the Court should consider and which support a finding that defendant abused its discretion in evaluating plaintiff's claim: (1) Hartford's initial 1999 decision to award plaintiff LTD benefits under the Plan was based on a finding that she was totally disabled from performing a sedentary occupation; (2) this Court concluded in *Holler I* that defendant's decision to disregard its 1999 award was arbitrary and capricious; (3) at defendant's urging, plaintiff applied for and was awarded Social Security benefits based on a finding that she was disabled from performing any jobs under the Social Security Act as of April 14, 1999; (4) defendant has demonstrated contempt for plaintiff by reporting her to the Ohio Department of Insurance, Fraud Division; (5)

4

there is no difference between plaintiff's limitations with respect to her own occupation, which was sedentary, and her ability to perform any occupation; (6) there is no evidence of medical improvement to warrant a finding that plaintiff's ability to perform work-related functions has increased since she was found disabled from her own occupation in *Holler I*; and (7) defendant's dual role as both plan funder and claims administrator gives rise to a conflict of interest which must be factored into the Court's review of plaintiff's claim.

In response, defendant counters that it's decision was not arbitrary and capricious but was based on independent reviews of the medical evidence provided by plaintiff, and a review by a vocational counselor, which demonstrated that she was able to perform a range of sedentary work and therefore was not disabled from "any occupation" under the terms of the Plan. Defendant argues that the Court's decision in *Holler I* does not estop Hartford from reviewing the claim anew under the "any occupation" provisions of the contract. Defendant also argues that while it considered the fact that plaintiff was awarded social security benefits, it was not bound by such a finding to conclude that she was disabled under the "any occupation" terms the policy. Defendant notes that plaintiff's "any occupation" claim was reviewed by a claims personnel in a separate and distinct location from those who reviewed her "own occupation" claim in *Holler I* and that both the initial review and the review on appeal included file reviews by medical experts. Defendant contends that any conflict of interest inherent in its dual role as claims administrator and claims payor is thus mitigated by the independent opinions upon which its reviewers relied in rendering their decisions, both on the initial review and the administrative appeal.

5

## STANDARD OF REVIEW

The Court reviews *de novo* a denial of benefits under an ERISA plan "unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *University Hosps. v. Emerson Elec. Co.,* 202 F.3d 839, 845 (6th Cir. 2000). If an administrator has such discretionary authority, the Court reviews the denial of benefits under the arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111 (1989); *University Hosps.,* 202 F.3d at 845.

The arbitrary and capricious standard applies in the present case because the Plan gives Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (AR 18). "When a plan administrator has discretionary authority to determine benefits, [the Court] will review a decision to deny benefits under 'the highly deferential arbitrary and capricious standard of review.'" *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595 (6th Cir. 2001) (quoting *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380 (6th Cir. 1996)).

Nonetheless, as noted by the Sixth Circuit, merely because the review is deferential does not mean that it is inconsequential. *Moon v. UNUM Provident Corp.,* 405 F.3d 373, 379 (6th Cir. 2005). The Appellate Court explained as follows:

> While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber-stamping those decisions. As we observed recently, "[t]he arbitrary-and-capricious ... standard does not require us merely to rubber stamp the administrator's decision." *Jones v. Metropolitan Life Ins. Co.,* 385 F.3d 654, 661 (6th Cir. 2004) (citing *McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 172 (6th Cir. 2003)). Indeed, '[d]eferential review is not no review, and deference need not be abject." *McDonald,* 347 F.3d at 172. Our task at

all events is to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." *Id.*

*Id.*

If the administrative record, as it existed at the time of the administrator's final decision, supports a "reasoned explanation" for the termination of benefits, the decision is not arbitrary or capricious. *Id.* (citing *Williams v. International Paper Co.,* 227 F.3d 706, 712 (6th Cir. 2000)). *See also Wilkins v. Baptist Health Care Sys.*, 150 F.3d 609, 615 (6th Cir. 1998). Moreover, where, as here, the defendant acts as both the Plan Administrator and Plan Insurer, these dual roles create a conflict of interest which the Court must consider as a factor when evaluating whether defendant abused its discretion by denying the benefits claim. *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. —, 128 S. Ct. 2343, 2350 (2008). Thus, when there is a conflict of interest, "the reviewing judge should take account of that circumstance as a factor in determining the ultimate adequacy of the record's support for the agency's own factual conclusion." *Glenn*, 128 S. Ct. at 2352 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 492-97 (1951)).

## OPINION

Having throughly reviewed the Administrative Record, as well as the initial decision to deny plaintiffs' "any occupation" claim and the denial decision rendered on appeal, this Court concludes that the record does not support a "reasoned explanation" for defendant's decision to deny benefits. The Court's conclusion is based on the following factors.

7

## Defendant's Denial Decision Ignored
## Plaintiff's Social Security Disability Award

Defendant Hartford argues at length in their responsive memorandum that plaintiff's award of social security benefits is not determinative of whether she is disabled under the Hartford Plan. The Court agrees that nothing in the Plan requires Hartford to forego a review of plaintiff's eligibility for benefits under the "any occupation" provisions of the Plan based solely on the fact that she was awarded social security disability benefits for her disability. Nevertheless, like the *Glenn* Court, this Court finds it highly questionable that Hartford required plaintiff to apply for social security benefits based on the position that she could do no work, then received the bulk of those benefits as a set-off to the plan benefits owed her under the "own occupation" policy provisions, and then ignored the agency's finding in concluding that she could in fact do sedentary work. 461 F.3d 660, 666-669 (6th Cir. 2006), *aff'd* and *cited with approval*, 128 S. Ct. at 2352. *See also Darland v. Fortis benefits Ins. Co.*, 317 F.3d 516 (6th Cir. 2003).

While defendant argues that it"acknowledged" the social security award, it contends that plaintiff failed to include "the detailed decision customarily issued that would explain the evidence that formed the basis for the SSA" conclusion." (Doc. 27, pp. 20-21). However, nowhere in either the initial denial letter dated June 2, 2006, (ADM 196-202) or the September 29, 2006 letter affirming denial of plaintiff's "any occupation" claim on appeal, (ADM 30-40), do the claims reviewers even mention plaintiff's social security award as a document which they reviewed or considered. Nor did these reviewers state that they ignored the conclusions of the Social Security Administration based on a lack of documentation. Furthermore, none

8

of the medical reviewers hired by Hartford to review the medical files cited to or listed the social security award as a document that was included for review with the records they considered. By contrast, where defendant's reviewers, such as Drs. Bress, Clark and Popovich, determined that they needed additional information, they asked for it. (*See e.g.* ADM 62, 66 noting that the doctors reviewing plaintiff's medical files made phone calls to the treating physicians for additional information).

At best, this represents a post-hoc rationalization for why defendant did not consider plaintiff's social security award. The Sixth Circuit looks with disfavor upon such post-hoc rationalizations, as this District Court noted in *Holler I*:

> It strikes us as problematic to, on one hand, recognize an administrator's discretion to interpret a plan by applying a deferential "arbitrary and capricious" standard of review, yet, on the other hand, allow the administrator to "shore up" a decision after-the-fact by testifying as to the true basis for the decision after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to defend the decision by developing creative post hoc arguments that can survive deferential review.

*University Hosps.*, 202 F.3d at 849 n.7. While plaintiff's social security award was in her file as evidenced by the fact that it was a part of the administrative record in this case, (see ADM 595-610), no one considered the SSA disability award in determining whether she could perform "any occupation" under the Plan, or set forth any reasons whatsoever why the award does not support her claim for LTD benefits under the Plan. *Cf. Green v. Prudential Ins. Co. of America*, 383 F. Supp.2d. 980, 999 M.D. Tenn. 2005)(defendant's decision to deny benefits did not improperly ignore social security decision where defendant acknowledged decision in its denial letter and explained differences between the standards for an award under SSA

regulations and the criteria applicable under the plan at issue thereby demonstrating reasonable review of the SSA decision). Accordingly, this factor supports the conclusion that defendant's denial decision was not rational in light of the quality and quantity of evidence on the record.

## Defendant's Decision to Deny Benefits Based on a Lack of Objective Evidence to Support Plaintiff's Fibromyalgia Diagnosis Is Not Rational

As the Magistrate Judge noted in Holler I,

"Fibromyalgia" has been described as follows:

> Fibromyalgia is a form of rheumatic disease with no known cause or cure. The principal symptoms, which are entirely subjective, are pain and tenderness in muscles, joints and ligaments, but the disease is frequently accompanied by fatigue, sleep disturbances, anxiety, dizziness, irritable bowels and tension headaches.

*Walker v. American Home Shield Long Term Disability Plan,* 180 F.3d 1065, 1067 (9th Cir. 1999) (citing Arthritis Foundation Pamphlet, Fibromyalgia 6-8 (1989)).

(*Holler I*, Doc. 31, p. 10).

The diagnosis of fibromyalgia can be vexing as it cannot be confirmed by medical or laboratory testing and commonly turns on subjective reports of pain. *Green*, 383 F. Supp.2d 996.

The Sixth Circuit has recognized the difficulty of diagnosing fibromyalgia:

Unlike most diseases that can be confirmed or diagnosed by objective medical tests, fibrositis can only be diagnosed by elimination of other medical conditions which may manifest fibrositis-like symptoms of

10

musculoskeletal pain, stiffness, and fatigue.

*Preston v. Secretary of Health & Human Servs.,* 854 F.2d 815, 817-819 (6th Cir. 1988). Moreover, the Sixth Circuit Court of Appeals has recognized the difficulties of assessing whether a claimant allegedly suffering fibromyalgia, or fibrositis, is disabled:

> Fibrositis causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances. In stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results -- a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease[.]

*Id.* Despite these difficulties, the Sixth Circuit has held that fibromyalgia can be disabling. *Green*, 383 F. Supp.2d (citing *Preston*, 854 F.2d at 818). Nevertheless, defendant initially denied plaintiff's claim in because it concluded that there was a lack of objective medical evidence to support her doctors' diagnosis of fibromyalgia.

In its June 2, 2006 letter denying plaintiff's "any occupation" claim, defendant sets forth the applicable plan provisions, a recitation of the specific documents relied upon, and a summary of the medical records considered, as well as a brief discussion of the report by Dr. Popovich who was hired by defendant Hartford to review plaintiff's medical records. (*See* ADM 196-202). Defendant states that "Dr. Popovich . . . found that the records provided complaints of your pain but do not contain objective medical evidence to support your impairment. . . and the impairments are not supported by the results of objective studies. Also, when seen at Christ Hospital, your neurological examination showed normal strength and gait."

11

" (ADM 200). The decision further states:

> Due to the above, *along with a lack of objective medical evidence* we have concluded that you are able to sit, stand and walk and can perform full time work at a sedentary or light duty level.

(Id.)(emphasis added). As this District Court has already recognized in *Holler I*,

> In this case, where treating physicians and specialists have diagnosed fibromyalgia, and the medical research indicates that there are a lack of objective tests to prove this condition, it is unreasonable to require objective findings.

(*Holler I*, Doc. 33, pp. 5-6)(citing *Green*, 383 F. Supp.2d at 997). The same reasoning applies to the denial decision in the present case. *(See also Pralutsky v. Met. Life Ins. Co.*, 316 F. Supp.2d 840, 850 (D. Minn. 2004)(where plan documents do not require submission of objective evidence, and in context of claim based on fibromyalgia, it was arbitrary and capricious for Plan Administrator to require such objective evidence).

As noted above, the *Preston* Court has recognized that "physical examinations will usually yield normal results -- a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." 854 F.2d at 818. Thus, Dr. Popovich's conclusion that the record lacked evidence to support plaintiff's claim based, in part, on reference to a normal neurological examination, is unreasonable. Moreover, Dr. Popovich's conclusion that there is no objective medical evidence to support the diagnosis of fibromyalgia is belied by the record. Dr. Blatman issued a letter on August 28, 2003, setting forth the findings from his clinical examination of plaintiff, as well as the results of "pressure plethysmography testing" which he used to assess trigger points. (ADM 480-81). Rather than discussing the relative merits

12

of this testing method or his interpretation of the results, Dr. Popovich apparently ignores it altogether in concluding that there is no objective evidence on the record. Indeed, Dr. Popovich's review of the August 28, 2003 letter is confined to his summary of Dr. Blatman's opinion "that Mrs. Holler was totally disabled from any occupation." (ADM 264).

## Dr. Bress's Opinion Was Not Reasoned or Rational in Light of the Record

Plaintiff appealed the administrative decision to deny her claim for LTD benefits under the "any occupation" provisions of the Hartford Plan. This appeal triggered a second claims review by defendant's Appeals Unit which included reviews of the medical file by two physicians, Drs. James Bress and John Clarke. Dr. Clarke's review was limited to consideration of the medical records as they relate to plaintiff's cardiac condition. (ADM 39). Defendant's decision on appeal sets forth the additional documentation relied upon, its summary of the medical evidence reviewed on appeal, and defendant's conclusion that plaintiff had the functional capacity to perform at least sedentary work and therefore was not disabled from "any occupation" under the terms of the Plan. (ADM 30-40). Defendant Hartford relied heavily in its appellate decision on Dr. Bress's opinion that "[t]here is no evidence to support fibromyalgia and no limitations from fibromyalgia." (ADM 38). Rather, Dr. Bress concludes that any limitations plaintiff has on her ability to perform work functions "are primarily due, as stated, to the pulmonary and cardiac condition." (Id.). As will be dismissed more fully below, the record does not provide a "reasoned explanation" for these conclusions, and thus these conclusions are not sufficient to support the denial decision in this case.

In determining whether defendant's decision was arbitrary and capricious, this Court is tasked with "review[ing] the quantity and quality of the medical evidence and the opinions on both sides of the issues." *McDonald*, 347 F.3d at 172. While courts cannot require administrators to accord special weight to the opinions of a claimant's treating physician, nevertheless, plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." (*Holler I*, p. 6) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). In this case, the administrator disregarded the opinions of plaintiff's treating physicians, Drs. Blatman and Diller, who both concluded that plaintiff's limitations precluded her from performing work activities for a full 8-hour work day. Instead, defendant relied upon the opinions of Drs. Bress and Clarke to conclude that plaintiff was not so limited. The Court notes that in this case, neither Dr. Bress nor Dr. Clarke were independent medical experts who examined plaintiff. Rather they were both non-examining file reviewers who were hired by defendant Hartford. Dr. Bress's opinion, as discussed below, was based on a review and summary of the record which mischaracterizes and gives a mis-impression of the evidence related to plaintiff's fibromyalgia and corresponding impairments. Consequently, the Court views Bress's opinion, and defendant's explanation for its decision based on that opinion, with some skepticism. *Moon*, 405 F.3d at 381-82.

Dr. Clarke's opinion is based on a review of the medical record with regard to plaintiff's cardiac condition and the limitations related thereto. Plaintiff concedes that the limitations from her cardiac condition as described by her treating cardiologist, Dr. Hutchins, do not preclude her from all work activity. However, as plaintiff notes, her disability claim was not based on her cardiac condition. Rather, her claim under

14

the Plan was based on fibromyalgia, thoracic outlet syndrome, and low back pain. Moreover, Dr. Hutchins makes clear in a letter dated June 28, 28, 2006, that the Physical Capacity Evaluation (PCE) form he completed on February 27, 2006, was completed based solely on his evaluation of plaintiff as her cardiologist: "[a]ll of the issues addressed in the form pertain specifically to her heart disease and are unrelated to any other ailment or disability she may have." (ADM 84).

Dr. Blatman completed a PCE Form on March 6, 2006, indicating that plaintiff was limited to sitting for 15 minutes at a time for a total of 2 hours per day, standing for 15-30 minutes at a time for a total of 2 hours per day, and walking for 15-30 minutes at a time for a total of 2 hours per day. (ADM 340-41). He also restricts her to lifting no more than 20 pounds occasionally and only occasional driving, climbing, stooping, kneeling, crouching, and crawling. (Id.) He notes that if she undertakes an activity on particular day because it has to be undertaken, she experiences increased pain on the following days. (ADM 341). Dr. Diller completed a PCE Form dated June 30, 2006, which similarly limits plaintiff to 2 hours each of sitting, standing, and walking for a total of six hours combined per day. (ADM 181). Neither of these physicians who have treated plaintiff for fibromyalgia, among other conditions, has opined that plaintiff can walk, sit, or stand for a combined total of eight hours per day. Notwithstanding their opinions, Dr. Bress concludes that plaintiff can sit for six hours of an eight hour work day with occasional walking or standing and is thus capable of full-time sedentary work. (ADM 63). Dr. Bress cannot rationally base this conclusion on the PCE by Dr. Hutchins which was limited to consideration of plaintiff's cardiac condition, and which Dr. Hutchins clearly indicated did not include any consideration of other conditions or illnesses from which plaintiff suffers.

Defendant may be justified in determining that plaintiff is not disabled from all work based on her cardiac condition alone. However, defendant cannot rely on Dr. Hutchins's PCE to conclude that the opinions of Drs. Blatman and Diller, who did consider plaintiff's limitations from fibromyalgia, are contradicted by other evidence and therefore should be disregarded. Nevertheless, this is exactly what Dr. Bress appears to have done. (*See* ADM 37-38; 63-64). Dr. Bress supports his opinion with reference to the February 26, 2006 PCE completed by Dr. Hutchins, the results of a stress test plaintiff underwent in December 2004, the October 2000 video surveillance report, and his determination that multiple notes do not mention trigger points or fibromyalgia, and his determination that plaintiff "do[es] not meet the $ACR^2$ criteria for fibromyalgia." In so doing, Dr. Bress concludes not only that plaintiff can perform a range of sedentary to light work for a full 8 hours per day, but as noted above, he also concludes that "[t]here is no evidence to support fibromyalgia and no limitations from fibromyalgia." (ADM 38). These conclusions are based on Dr. Bress's mischaracterization and misstatement of the record.

Dr. Bress's conclusion that there is no evidence to support fibromyalgia or limitations therefrom is supported in part by a written report summarizing the October 2000 video surveillance tape which defendant relied upon in part to support its denial decision in *Holler I*. As the Court noted in *Holler I*, while the video surveillance may support that conclusion that plaintiff can perform a range of activities, it "does not establish that plaintiff can perform such activities for the

---

<sup>2</sup>  While the letter does not specify, the Court interprets "ACR" to stand for "American College of Rheumatology."

duration of an eight-hour work day, five days a week." (*Holler I*, Doc. 31, p. 11). Moreover, "reliance on the video surveillance report is undermined by the fact that the investigator waited outside plaintiff's residence for three days, yet observed plaintiff outside her home on only one day." (Id.). In addition, Dr. Bress did not actually observe plaintiff lifting or handling objects on the video; rather, he reviewed a written report which listed or summarized the activities she was alleged to have undertaken on the video. (ADM 58). He states that plaintiff has acknowledged that on "good days" she can perform all of the activities listed in the video summary. (ADM 63). The issue presented is not whether plaintiff can perform some or all of this laundry list of activities part of the time, but whether she can perform sustained work-related activity forty hours per week. As noted by the Court in *Holler I*, the video does not support such a finding. Nevertheless, Dr. Bress uses this evidence to conclude that plaintiff can perform these activities on a sustained basis and therefore is able to engage in the work activities associated with a range of sedentary to light work. (ADM 63).

Similarly, Dr. Bress puts great emphasis on the results of plaintiff's December 2004 stress test which was administered as part of her evaluation for coronary artery disease by Dr. Hutchins. Dr. Bress concludes that the results are inconsistent with the findings of her treating physicians that she has shortness of breath on exertion. Assuming that to be the case, the stress test standing alone does not constitute evidence that plaintiff can perform sustained work activity for eight hours a day, five days a week.

Finally, and perhaps most tellingly, Dr. Bress's report selectively refers to

17

certain portions of the record or mis-states or mis-characterizes the record to paint a picture from which to conclude there is a dearth of evidence to support the diagnosis of fibromyalgia by plaintiff's treating physicians. Dr. Bress states that "multiple notes do not mention trigger points" and specifically references notes by Drs. Henthorn, Hutchins, Schrock and Diller in support of this conclusion. Dr. Bress's statement that Dr. Henthorn's July 14, 2005 note "makes no mention of fibromyalgia" is directly contradicted by the "Impression" section of note itself. (ADM 104, 113-14). In addition, it bears noting that plaintiff was referred to Dr. Henthorn for a head-up tilt examination due to recurring problems with lightheadedness and dizziness, not for treatment or assessment of her fibromyalgia or any other condition. (Id.).

Dr. Bress likewise refers to a November 11, 2005 note by Dr. Hutchins, plaintiff's cardiologist, which includes a complaint of leg pain at night but does not discuss any complaints of fibromyalgia. Review of this record reveal that the note is also accompanied by a letter from Dr. Hutchins to Dr. Diller on that same date which indicates that the purpose of the office visit was to follow-up with plaintiff for coronary artery disease and persistent chest pain. (ADM 93-94). The letter also indicates that the Dr. Hutchins's note regarding plaintiff's leg pain was made in the course of ruling out claudication. (ADM 93). Thus, it is not rational to conclude that a lack of reference to fibromyalgia in this note indicates that plaintiff is not suffering from that disease.

Dr. Bress refers to two notes from Dr. Diller dated March 31, 2005 and April 28, 2005, which he also states do not mention tender points or plaintiff's fibromyalgia.

18

The April 28, 2005 note is from a follow-up appointment for numbness and tingling of the right arm and leg as well as chest pain. (ADM 432). Its reference to "no point tender" appears in a section addressing low back pain. (Id.). While Dr. Bress would single this note out to demonstrate a lack of references to tender points or fibromyalgia, there are multiple notes in the file from Dr. Diller which do refer to plaintiff's fibromyalgia and or tender points. (*See e.g.* ADM 121, 181, 147, 426, 440, 442, 443, 450). The March 31, 2005 note was from a follow-up visit following an emergency admission to Christ Hospital on February 23, 2005, and a low blood pressure reading taken at a prior follow-up office visit on March 4, 2005. (ADM 434-35).

Finally, Dr. Bress points to a note from Dr. Schrock dated February 23, 2005, which did not include a discussion of fibromyalgia or tender points, in support of Dr. Bress's opinion that there is no evidence to support plaintiff's fibromyalgia diagnosis or related limitations. As mentioned above, plaintiff was admitted to Christ Hospital on an emergency basis on February 23, 2005. Review of the note from Dr. Shrock reveals that plaintiff presented in the doctor's office that day complaining of shortness of breath and lightheadedness and that she was on breathing medication without improvement. Based on Dr. Shrock's review of her vitals and an EKG test that day, he recommended that she be admitted to the emergency department "to evaluate for MI vs. Heart failure vs. pneumonia." (ADM 436-37). It defies common sense to conclude that the lack of reference to fibromyalgia when plaintiff was being rushed to the ER somehow supports the conclusion that she does not also suffer from that illness.

19

The Administrative Record as a whole is replete with medical records which address plaintiff's fibromyalgia. Indeed, that diagnosis is among the reasons why she began treating with Dr. Blatman in the first instance. (*See e.g.* ADM 355, 373-74, 480-81). Her treating physicians who deal with her fibromyalgia, among other conditions, have rendered opinions that she cannot sustain work activity for a full eight hour day. These opinions are not contradicted in the record by any other physician who has examined and or treated her for fibromyalgia. Dr. Bress's review of the medical record upon which defendant relies to deny plaintiff's benefits claim selectively focuses on certain documents to the exclusion of others and mischaracterizes the record evidence to support his opinion. His opinion cannot be supported by a rational review of the record. Not only does he disregard the opinions of Drs. Blatman and Diller as to plaintiff's functional limitations resulting form her fibromyalgia, he goes so far as to conclude that the records do not support such a diagnosis in the first instance, or any limitations deriving therefrom. These conclusions are neither reasonable nor rational in light of the Administrative Record.

## **Defendant's Conflict of Interest Is Entitled to Significant Weight**

As noted above, a conflict of interest exists where the claims administrator of an ERISA benefit plan serves dual roles as both Plan Administrator and Plan Insurer. It si undisputed that defendant Hartford filled these dual roles in the present case. The Court must take this factor into account when considering whether defendant's decision to deny benefits was arbitrary and capricious. The Court agrees with defendant that the mere existence of such a conflict is not sufficient in and of itself to find an abuse of discretion on the part of the Hartford Plan. *See Green*, 461 F.3d

at 666, 674. However, in this case, and given the other factors discussed above, the conflict is entitled to greater weight. The fact that defendant required plaintiff to apply for social security disability benefits under the theory that she could not do any work and then ignored the SSA decision to award benefits, coupled with its unreasonable requirement of objective evidence to support plaintiff's fibromyalgia diagnosis, and its heavy reliance on Dr. Bress's opinion which supported by the record, the Court calls to question Hartford's "seemingly inconsistent positions [which] were both financially advantageous." *Green*, 128 S. Ct. at 2352.

Upon review of the record as a whole, Dr. Bress's conclusions and defendant's reliance thereon are neither reasonable nor rational and cannot support Hartford's decision to deny benefits under the Plan. Plaintiff was awarded LTD benefits under the Plan's "any occupation" provisions based on the limitations imposed by fibromyalgia, COPD and low back pain. Defendant then reversed course. This Court reversed defendant's denial decision in *Holler I* based on defendant's unreasonable rejection of plaintiff's treating physician's opinion concerning the limitations imposed by her diagnosed fibromyalgia. In this case, as discussed above, defendant's initial denial of plaintiff's claim was based on the untenable position that there was no objective evidence to support impairment based on fibromyalgia. Defendant has improperly ignored the Social Security Administration's finding that plaintiff is disabled from her impairments, and seeks to rest its denial decision on a selective reading and mischaracterization of the record. This it cannot do.

21

For all these reasons **IT IS HEREBY RECOMMENDED THAT:** Plaintiff's motion for judgment on the pleadings be **GRANTED** and judgment be entered in her favor on her ERISA claim.

Timothy S. Hogan
United States Magistrate Judge

Kathy D. Holler,
    Plaintiff

vs

Case No. 1:06-cv-764-MHW-TSH
(Watson, J.; Hogan, M. J.)

Hartford Life and Accident
Insurance Company,
    Defendant

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), within fourteen (14) days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).